No. 10-1775

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| APRIL ORTIZ, as administrator of the ESTATES OF MAY MOLINA and MICHAEL ORTIZ, | ) | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division |
| Plaintiff-Appellant, | ) | |
| v. | ) | No. 04 C 7423 |
| CITY OF CHICAGO, et al., | ) | |
| Defendants-Appellees. | ) | Honorable John F. Grady, Judge Presiding |

**REPLY BRIEF AND APPENDIX**
**OF PLAINTIFF-APPELLANT**

Arthur Loevy
Jon Loevy
Elizabeth Wang
LOEVY & LOEVY
312 N. May St., Suite 100
Chicago, Illinois 60607
(312) 243-5900

Counsel for Plaintiff-Appellant

January 28, 2011

## TABLE OF CONTENTS


TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. The Lower Court Correctly Found A Jury Question On Whether At Least Some Defendants Had Notice Of A Need For Assistance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A. Yost And Gilchrist . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Attorney Bischoff's Observations . . . . . . . . . . . . . . . . . . 1

Bischoff's Plea For Medical Assistance . . . . . . . . . . . . . . 3

Defendants' Acknowledgment . . . . . . . . . . . . . . . . . . . . . 4

B. Jamison, Pryor, And Gomez . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Express Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Diane Rice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Inferred Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Jasmine Vaccarello . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Molina's Initial "Rejection" Of Hospitalization . . . . . . . 11

C. Ramirez, Wallace, and Holmes . . . . . . . . . . . . . . . . . . . . . . . . 12

II. Summary Judgment Was Inappropriate On Proximate Cause . . . . . 13

A. Dr. Adelman's Qualifications, Methodology, And Opinions Remain Unassailable . . . . . . . . . . . . . . . . . . . . 14

B. The Purported Shortcomings In Adelman's Opinions Did Not Justify Barring His Diabetes Opinion . . . . . . . . . . . . 15

1. Contrary To The District Court's Key Assumption, Adelman Did Review Molina's Medical Records . . . . . . 15

2. Defendants' Kussmaul Respiration Argument Is Equally Misplaced . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

3. Post-Mortem Glucose Levels Are Irrelevant . . . . . . . . . 17

4. Possible Absence Of Keotones Does Not Support Exclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

C. Adelman's Myxedema Opinion Should Not Have Been Barred . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

D. The Medical Examiner's Opiate Intoxication Theory Is Far More Speculative Than Adelman's Opinions . . . . . . . . 20

E. Even If Molina's Death Was Due, Even In Part, To Opiate Intoxication, Summary Judgment Was Still Inappropriate Given Dr. Carter's Opinion . . . . . . . . . . . . 21

The Court Never Barred Carter As Untimely . . . . . . . 21

Dr. Carter's Opinions . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

III. Qualified Immunity Is Unavailable . . . . . . . . . . . . . . . . . . . . . . . . . . 24

IV. Over-Detention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

**CASES** **PAGE**

Garcia v. City of Chicago, 2003 WL 22023931 (N.D.Ill. May 2, 2003) . . . . . . . . . . 10

Gayton v. McCoy, 593 F.3d 610 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Villanova v. Abrams, 972 F.2d 792 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . 24

Luck v. Rovenstine, 168 F.3d 323 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 24

**AUTHORITY**

Seventh Circuit (Civil) Instr. 1.14. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## Introduction

What is most telling about Defendants' Response is where they begin their argument. Considering the district court agreed with Plaintiff that at least some Defendants acted with unconstitutional unreasonableness, and further considering the abundance of solid evidence supporting that proposition, Defendants face an uphill battle to persuade this Court to conclude differently.

Yet this is exactly where Defendants focus their appellate energy. It is not until page 35 that their Response first attempts to defend the actual reason the court granted summary judgment, namely, a proximate cause argument never even raised by Defendants below.

Defendants' tactical decision is an implicit recognition that the exclusion of Plaintiff's experts fails to withstand scrutiny. The district court's most important criticisms of Dr. Adelman were based on factual assumptions that were wrong, and the remaining quibbles are the type that go to weight, not admissibility. Nor do Defendants present any persuasive defense of the lower court's decision to simply ignore Dr. Carter's opinions; her testimony alone suffices to overcome summary judgment.

## I. The Lower Court Correctly Found A Jury Question On Whether At Least Some Defendants Had Notice Of A Need For Assistance

### A. Yost And Gilchrist

The court correctly found material disputes as to these Defendants. Nothing in Defendants' Response alters that result.

#### Attorney Bischoff's Observations

First, the court properly relied upon Bichoff, the veteran criminal defense attorney who personally observed Molina's condition. As set forth in the opening brief, Bischoff testified that Molina could barely breathe, appeared groggy, had trouble keeping her head up, and could hardly communicate. Molina's distress

was sufficiently apparent to Bischoff that, even as a layperson, he was able to surmise (correctly) that she was an unmedicated diabetic. Bischoff quickly concluded she could not productively converse in that condition, and that she needed not just her medications, but hospitalization.

Seeking a more favorable spin, Defendants' Response largely abandons their summary judgment numbered paragraphs; instead, the Response cites directly to Bischoff's deposition, cherry-picking the most favorable-sounding answers. Resp. 8-9. In Defendants' retelling, for example, Bischoff was merely complaining that Molina "appeared more uncomfortable" than during prior encounters, and "did not seem as sharp as usual." Id.

That is not the only way to read Bischoff's deposition, and not the most favorable. Bischoff described a woman who could not even answer questions audibly and who was in obvious need of medical attention. R233-3 at 18, 30 ("I told them that May should go to a hospital...I said, she clearly is not well.").

Defendants counter that "Yost and Gilchrist were not in the interview room with Bischoff," and conclude that "nothing outside their presence ... can constitute notice to them." Resp. 28. This argument fails for two reasons.

First, Bischoff was in position to describe Molina's objective appearance, *i.e.,* how she appeared to anyone interacting with her. In contrast to how Molina presented at her initial intake (able to talk and breathe easily), she was in a completely different condition by the time Bischoff saw her on the afternoon of May 25.[1]

[1] By then, Defendants concede it took as long as two minutes for Molina to walk about ten feet. Even a 300+ pound person should cover spans of two feet in under 24 seconds.

Second, Defendants' argument proves too much. Because Yost and Gilchrist were not present in the interview room, the only information available to them about the Molina-Bischoff encounter was what was communicated by Bischoff, who unambiguously informed them Molina required hospitalization. In that light, Defendants' attempts to minimize what Bischoff personally observed become less important. What matters is that when he emerged from the room, Bischoff put Yost and Gilchrist on notice that Molina was in substantial distress. R233-3 at 17 ("she's clearly sick, get her to a hospital").

**Bischoff's Plea For Medical Assistance**

Defendants submit that Bischoff's warning that "she's clearly sick, get her to a hospital" did not, in their words, "put them on notice of a need to get Molina to a hospital immediately." Resp. 29. Their argument is unpersuasive.

Defendants first note they (a) knew nothing of Bischoff's bonafides, and (b) are not themselves doctors. This only makes it all the more unreasonable to ignore a hospital request, without so much as even ascertaining the basis, from an attorney who had just spent ten minutes interviewing the person. A23 ("What Ms. Molina's condition was, of course, was unknown to Yost and Gilchrist, but in a sense that is the very point. They did not know, and arguably took an unreasonable risk in failing to call for competent medical help.").

Reaching even deeper, Defendants argue that they "had no reason to accept [Bischoff's] word" because Molina said nothing, despite standing right there. Resp. 30. Leaving aside that this argument requires the Court to view evidence most favorably to Defendants, the proposed inference is not compelling. Molina's failure to contravene a request for hospitalization is no less significant than if she had requested it herself – and even more so when one credits Plaintiff's evidence that her silence owed to inability to breathe or talk.

In sum, all of Defendants' attempts to overcome Bischoff's testimony share a common characteristic: each invites the Court to play juror, and draw pro-defense inferences to boot. Perhaps a jury would agree that it was reasonable to disregard Bischoff's request for one reason or another, but reasonableness is a classic jury question.

**Defendants' Acknowledgment**

Were there lingering doubt, perhaps the most damning evidence was the response to Bischoff's hospitalization request.

They did not say: "What are you talking about?" They did not say: "We disagree with you, she seems fine to us." What they said was: "We're working on it, counselor," an acknowledgment (at least arguably) of an immediate need for action.

Lacking any answer, Defendants postulate about what Yost and Gilchrist "likely meant." According to Resp. 30, saying "we're working on it" directly in response to the request to take Molina to Cermak hospital "likely meant" that they were processing her for bond court.

Defendants' view of what was "likely meant" is no basis for summary judgment. Even if Defendants' argument made sense, which Plaintiff disputes, this is hardly the only reasonable inference. The more plausible inference is an acknowledgment of the need for hospitalization. And even assuming *arguendo* that Defendants' version were credited, the notion that they really meant getting her ready for court does nothing to change their acknowledgment of the need to do *something,* which is what really matters.

In light of Yost and Gilchrist's acknowledgment of the need to respond to a hospitalization request, the requisite notice is sufficiently established. From there, it is a short hop to an unconstitutionally unreasonable response, because

by Defendants' own admission, no one did anything to secure assistance. A jury could find liability, and the district court did not err.[2]

At the end of their argument concerning Yost and Gilchrist, Defendants point out that their work shift didn't overlap with Rice or Vaccarello's detention. While true, this doesn't change the result. The foregoing evidence is more than sufficient standing alone.

If anything, Defendants raise this point at their peril. It is a recognition that summary judgment was over-granted. The court concluded (properly) that Vacarrello and Rice's pleas for assistance, considered with Bischoff's description of Molina's objective appearance, were sufficient. Unfortunately, the court failed to consider the Vacarrello and Rice testimony against those Defendants who actually ignored them. Correcting for that mistake, there are additional Defendants (Jamison, Pryor and Gomez) who, by the court's own reasoning, were not entitled to summary judgment.

### B. Jamison, Pryor, And Gomez

The evidence suffices to create a jury question on whether Jamison, Pryor, and Gomez had sufficient notice of a need for assistance.

**Express Notice**

From the start of her detention on May 24, Molina put Jamison and Pryor on notice that she had a diabetes and thyroid condition requiring medications. They asked her, she told them, and they wrote it down. Quoting Molina's answers, her diabetes and thyroid medical problems were "serious."

---

[2] As the Response's table of contents confirms, sufficient notice of a serious medical need are the claim's only remaining disputed elements. The other Sides factors drop out because (a) the necessary assistance was no more complicated than providing medicine; (b) the defense here is that they would have immediately provided that access, if only Molina had asked or exhibited a need.

### Diane Rice

After receiving that notice, Jamison and Pryor remained on duty until 5:30 a.m. on May 25, during which time Rice arrived in the Lockup. Though Defendants deny Molina ever asked for a doctor, Rice avers (and contemporaneously claimed) that Molina *did* ask for a doctor, but was told: "we asked you when you came in [on May 24] if you needed a doctor and you said 'no.'"

Not surprisingly, Defendants contend they would never so flippantly disregard a medical request, at least not without investigating further. Instead, Defendants claim no such request was made. The resulting discrepancy presents a dispute of material fact.[3]

### Inferred Notice

When Jamison returned at 9:30 p.m. for her overnight (May 25-26) shift, Molina was still where Jamison had left her. And no one claims Molina was on the verge of getting access to the medications she'd originally described to Jamison – at the very earliest until morning.

While Jamison had been gone, Bischoff had requested hospitalization and been told "we" (the jailers) are "working on it." There had also been up to ten calls from concerned family members regarding Molina's medications. Although

[3] Defendants' Response complains that Plaintiff did not submit Rice's testimony until after summary judgment was briefed. Defendants ignore the reason why, namely, that they held back Rice's identity for almost two years. As explained in Plaintiff's opening brief (without rebuttal), discovery was inhibited by a series of stays; Defendants convinced the court that the case was best resolved by staying all discovery other than that related to "cause of death" until Defendants could bring their dispositive Rule 56 motion. Whatever "cause of death" means, the City unilaterally determined that it didn't include any obligation to turn over the OPS file, containing the identities and statements of not only Rice, but also Bischoff, Vaccarello, and others. Plaintiff thus did not discover these facts until very late in the day. In Rice's case, Plaintiff's counsel was not even able to locate her and obtain an affidavit until summary judgment was briefed. Had Chicago disclosed Rice's identity and OPS statement at the outset, there wouldn't have been a need to supplement.

it would require a favorable inference to assume Jamison was informed of such matters, it is hardly implausible to assume that jailers keep each other abreast of relevant developments as shifts change. That is, after all, the nature of the job.

Plaintiff hardly needs to rely exclusively on the foregoing inference. There is also direct evidence of notice to Jamison and Gomez, evidence the court found persuasive.

**Jasmine Vaccarello**

Jamison and Gomez worked the final overnight shift. As Defendants' Response points out, both testified that they checked Molina every fifteen minutes, and claimed she always appeared fine (except when she was dead). Jamison and Gomez both recalled Molina's breathing as not shallow or rapid, and saw her chest rising appropriately. That level of memory might seem self-serving, but their job did require them to protect detainees by watching closely.

The real problem here is that the facts are contested. Vaccarello insists no cell checks occurred before Molina's death. The jailers entered the call area only once, when a prisoner arrived. Defendants' Response points out that Vaccarello was not awake all night, but Vaccarello testified that upon arrival, she was awake for at least two or three hours. R429 at 68. That defeats Jamison and Gomez' claim to have confirmed Molina's well-being every fifteen minutes.

Defendants argue alternatively that even if one credits Vaccarello, that only proves they were ignorant of Molina's deteriorating condition. This misses the point. Jamison and Pryor need to be able to rely on their alleged observation that Molina was fine, because they otherwise have no answer for Vaccarello's testimony: When a detainee provided notice of a "serious" medical need requiring diabetes and thyroid medicines, and when more than 27 hours passed without access to them, it was at least arguably unreasonable to respond "shut the F---

up" when Vaccarello tried to summon assistance for Molina, who had by then fallen into a soon-to-be fatal coma.

According to Vaccarello, and contrary to Defendants' testimony, Molina herself had pleaded for her medications. Resp. 35 takes issue with the term "begging," but that is basically how Vaccarello described it. R429 at 66 ("She was pleading. I mean, like asking, almost begging".) Later, when Molina lost consciousness and her breathing changed, Vaccarello was sufficiently alarmed to seek help. The jailers on that shift (Jamison and Gomez) responded with the profanity, and continued talking and laughing.

When Vaccarello stopped hearing Molina's breathing, Vaccarello tried unsuccessfully to rouse her, whereupon Vaccarello again tried to summon assistance. R429 at 74-77 ("I said, guard, excuse me, you know, she stopped snoring and she's not responding."). Again, the Lockup keepers ignored her.[4]

Vaccarello's testimony is sufficient to overcome summary judgment, even standing alone. A jury could easily find these Defendants acted unreasonably.

Defendants do not seriously attempt to persuade this Court otherwise. Instead, Resp. 33 claims that the court committed an "abuse of discretion to consider" Vaccarello's testimony at all.

In support, Defendants ask the Court to invent a new rule. Analogizing to law prohibiting affidavits that contradict depositions, Defendants contend that a deponent/affiant should be prohibited from contradicting, or even going beyond,

[4] Though not relevant to Rule 56, Defendants attack Vaccarello's credibility, noting she was abusing drugs and had "probably ingested drugs" that day. At her deposition, Vaccarello explained that she'd been introduced to heroin by a boyfriend in high school, and became addicted. R429, at 26-27. As with many heroin addicts, its primary effect was to make her "feel not sick." Id. at 29. She generally didn't do enough to actually get high, id., and it did not affect her memory at all. Id. at 36, 100.

whatever was written in the unsworn statements created by the City's own investigators. Id. This suggestion is preposterous.

Plaintiff begins with the obvious: there is no such rule. Where any party believes it can impeach sworn testimony with a prior inconsistent statement, that party is welcome to try. This Court's pattern jury instructions permit jurors, should they be inclined, to consider such matters when deciding what weight to place on sworn testimony. Seventh Circuit (Civil) Instr. 1.14. But there has never been any *per se* exclusion, and Defendants cite no cases holding otherwise.

Defendants' argument fails for another reason. Vaccarello denies she told OPS investigators anything inconsistent with her present testimony, so even that proposition is disputed. R429 at 14-16, 87-89. Vaccarello did not write up the statements, OPS did. Id. at 15. She did not claim to have read it for completeness, or even to have read it all. Id. at 86-87, 90 ("I read over it briefly, and she told me it was a brief description. . .").

There is an even bigger problem with Defendants' request to ignore Vaccarello's testimony on the grounds proposed here. For Defendants' argument to prevail, one first must accept their underlying premise that the City's OPS investigators are scrupulous and unerring recorders of the objective truth. The reason why any subsequent (inconsistent) statements must be disregarded, according to Defendants, is because any statement created by the City's OPS warrants a special presumption of accuracy and completeness.

Defendants may well believe that, and they are entitled to that world view. But in fairness, this is not the only world view. There is plenty of evidence supporting an inference of OPS bias.

For example, it is a matter of public record that OPS was sufficiently discredited by allegations of partial investigations that it was disbanded amidst

public pressure in 2007, and reorganized under a new name. The courthouse is replete with examples of accusations that OPS creates inaccurate, unfairly-slanted witness statements to protect the City's interests. E.g., Garcia v. City of Chicago, 2003 WL 22023931 (N.D.Ill. May 2, 2003) (jury verdict against OPS for "whitewashing" its investigations).

This Court obviously has no occasion to pass judgment on OPS' credibility. By the same token, however, there is absolutely no support for Defendants' proposed rule that unsworn statements created by Chicago's OPS investigators are so inherently trustworthy that witnesses must be precluded from ever creating contrary affidavits as a matter of law.[5]

As stated, the real reason Defendants are advocating invention of such an unprecedented (and dubious) exclusionary rule is the recognition that they cannot overcome Vaccarello's testimony. Because the district court did not "abuse its discretion" in considering this testimony, Defendants' position fails.

In closing on this point, it bears repeating that even the district court felt that Vaccarello's testimony helped to create a sufficient dispute of fact. A23. Where the district court went astray, however, was by mistakenly assuming that Yost and Gilchrist were the jailers who interacted with Vaccarello and Rice. As Resp. 30 acknowledges, it was actually Jamison, Gomez, and Pryor. That misunderstanding now corrected, summary judgment should be denied as to them as well.

---

[5] Defendants' argument that "[a]ffidavits, after all, are written by attorneys" (Resp. 33), though legally irrelevant, also happens to ignore that, unlike the OPS statement, most of Vaccarello's affidavit was handwritten by her. R266-6.

**Molina's Initial "Rejection" Of Hospitalization**

Defendants' Response relies heavily on their argument that when Molina first entered Lockup, she denied a need for hospitalization. Molina, being dead, is unable to contradict Defendants' descriptions of the exact questions and answers, but that said, the issue does not carry Defendants nearly as far as they suggest.

For purposes of this Reply, Plaintiff accepts that when Molina told the intake person that she had serious medical needs requiring medications, she also denied requiring immediate hospitalization. That answer, however, was provided at the very beginning of Molina's detention. By all accounts, there was no need for hospitalization at that time. Despite all the exertion associated with being taken from her apartment to the station to the Lockup, Molina was fine. She was able to talk, catch her breath, and answer questions.

However, Molina's initial response is hardly the end of the story. As she eventually began descending toward death, a detainee heard Molina calling for her medications, and another heard Molina requesting a doctor. Molina's lawyer specifically asked for hospitalization upon learning that she was an unmedicated diabetic who could no longer breathe or speak. It is thus no answer at all for Defendants to keep repeating that Molina *originally* declined to be hospitalized.[6]

[6] Following Defendants' logic, once Molina initially denied any need for hospitalization, she apparently forfeited access to her medications for the duration. But there is no testimony that anyone explained to Molina that declining hospitalization on May 24 would deprive her of medicines until court on May 26 – or, more importantly, that Molina supposedly agreed. Molina knew that she needed her medications to survive, and never voluntarily allowed herself to be without them for more than a few hours because she could become "dangerously sick and risk her life." R.233-20; R.265, ¶3.

### C. Ramirez, Wallace, and Holmes

Molina's daughter brought her diabetes and thyroid medications to the 23rd District, explaining to a sergeant that Molina needed them "to save her life." R.233-20. He refused them, explaining that Molina would be taken to a doctor or a hospital when she got to the Lockup. While working the desk at the Lockup, Ramirez got as many as ten calls from multiple people urging her to allow Molina access to her medications.

It is inconceivable that multiple people could call Ramirez that many times during one shift without conveying a sense of seriousness. In any event, the intake form had already alerted Defendants that Molina's medical conditions were "serious."

Ramirez tries to escape liability by passing the buck to her supervisors. According to Defendants, Ramirez acted reasonably because it was not her job to make decisions, and she passed the matter to her superiors.

It is undisputed that no supervisor took any action. Perhaps Defendants could convince a jury that it was reasonable to treat an athyroidal diabetic in this way, but total inaction for 27+ hours, notwithstanding up to ten attempts to provide her medications (after Molina had communicated in intake a serious need), should not have been deemed reasonable as a matter of law.

Summary judgment is thus inappropriate for the desk Defendant or the supervisor Defendants. Or both. But not neither. Someone must be responsible, and a jury is the only proper body to make that decision.

For the first time on appeal, Defendants raise the brand new argument that Ramirez' shift was over on May 25, before Wallace and Holmes began work. Resp. 26-27 (citing transcripts outside the record). Defendants' purported excuse for raising this now rather than previously is because Plaintiff is supposedly

raising a "new" theory on appeal. Ignoring the irony, Defendants argue that this Court must now ignore Plaintiff's "new" theory on waiver grounds. Id.

Defendants' position is nonsensical. Plaintiff is obviously pursuing the same "pass the buck" theory against the supervisors that she raised below. These supervisors' failure to act is the only claim that has ever been, or could be, made. Defendants are the ones who waived their new argument.

All that notwithstanding, Defendants appear to be correct that Ramirez left duty before Wallace and Holmes began work on May 25. That fact, however, does not clear them. As acting watch commanders, Wallace and Holmes presumably had access to all of the information from prior shifts, including Molina's intake form. Moreover, they were in charge as Molina entered her third calendar day without diabetes and thyroid medications, the most relevant time period. Finally, it is undisputed that supervisors make decisions on any requests for medications, such as Vaccarello's.

Thus, even assuming Defendants had not already waived this argument about Ramirez' shift hours, the most it proves is that perhaps other supervisors should lose too. It does not relieve Wallace and Holmes of responsibility.

## II. Summary Judgment Was Inappropriate On Proximate Cause

Defendants' Response concedes Plaintiff's citations that proximate cause is almost always a jury question, with summary judgment appropriate "only in the rare instance that Plaintiff can proffer no evidence that delay in medical treatment exacerbated an injury." Gayton v. McCoy, 593 F.3d 610, 624 (7th Cir. 2010). Against that backdrop, nothing in the Response alters the conclusion that the district court's refusal to consider Plaintiff's experts' opinions was error. Plaintiff begins with Dr. Adelman.

### A. Dr. Adelman's Qualifications, Methodology, And Opinions Remain Unassailable

Defendants have not, and cannot, dispute Adelman's qualifications to examine the available evidence and deduce a cause of death. Without rehashing his impressive resume, Adelman has employed that same methodology as a forensic pathologist literally thousands of times.

Here, Adelman relied upon Molina's medical records, medical conditions, medication list, autopsy photos, autopsy report, toxicology report, medical examiner deposition, witness statements, and death investigation reports, together with the medical literature governing diabetes and myxedema, and his four decades of experience in such matters. After carefully considering everything, Adelman opined that Molina died of complications from an untreated diabetic or myxedeatous coma brought upon by deprivation of her medications. Adelman further opined that timely medical attention could have saved her life.

The City has no shortage of friendly expert witnesses. If there were any expert, anywhere, who could have reviewed Molina's medical records and contradicted Adelman, presumably Defendants would have found one.

Instead, Defendants rely upon the uninformed opinion of the medical examiner who, unlike Adelman, *had no access to Molina's medical records, medical conditions, medication list, or the witnesses' accounts.*

The double-standard is too great to ignore. The district court made consideration of medical records the critical deal-breaker – and only Adelman considered them. The medical examiner did not. Yet Defendants propound the medical examiner's totally-uninformed opiate intoxication theory as the only valid explanation. Up is down, and down is up.

### B. The Purported Shortcomings In Adelman's Opinions Did Not Justify Barring His Diabetes Opinion

It is critical to identify exactly what flaws Defendants are relying upon. There are four, and only four. None is even remotely sufficient.

#### 1. Contrary To The District Court's Key Assumption, Adelman Did Review Molina's Medical Records

The four pages of the summary judgment opinion dealing with Adelman's supposed reliability problem rely heavily on the court's assumption that Adelman never considered Molina's medical records. Plaintiff's opening brief pointed out that this was completely wrong. In support, Plaintiffs cited to the record confirming that Adelman did review them. R130-1; R130-2; R233-14 at 1-5.

Defendants' Response (at 37-38) states that Adelman did not "examine her medical records." In support, Defendants cite back to the very district court opinion that Plaintiff demonstrated to be mistaken. Id.

As is hopefully obvious, Defendants' argument is fatally circular. The court's critical assumption was simply incorrect.

Defendants now attempt to salvage their position by contending that the hospital and medication/dosage records reviewed by Adelman were "six months to one year-plus before Molina's death." Resp. 38. That hardly saves them. There is no rule of law prohibiting pathologists from opining unless he reviews records less than six months old. Indeed, Defendants fail to introduce any evidence suggesting Molina's diabetes had resolved in the intervening months, and her missing thyroid certainly did not grow back.

More importantly, Defendants have departed the "abuse of discretion" zone. The court was factually incorrect in its assumption. It believed (wrongly) that Adelman had no idea what was ailing Molina. If Defendants want to defend a rule that six month old records are too old for a pathologist to consider, nothing

is stopping them from cross-examining. But they cannot wrap themselves in abuse of discretion. The district court made no such ruling.

Nor does the proposed rule make any sense. Are Defendants truly suggesting that pathologists could never give competent testimony without a current physical? Admittedly, the principle the district court (mis)applied was not totally devoid of merit – if a pathologist genuinely has no clue about the deceased's medical conditions, perhaps there could be a problem. But having "no clue" is not the same as having slightly dated records.

Finally, Defendants argue that Molina's medical records do not themselves prove the "effect of going without medication." Resp. 39. Medical records never do that. They present a clinical picture, and pathologists like Adelman are qualified to fill the gap with knowledge, experience, and medical literature.

### 2. Defendants' Kussmaul Respiration Argument Is Equally Misplaced

Defendants next seek to justify the exclusion of Adelman's diabetic-coma opinion based on the purported absence of Kussmaul respirations. That argument fails for the following reasons.

First, purported "absence" of Kussmaul breaths is a stretch. Lacking any recording of Molina's breathing, Adelman's deposition answers referred to two OPS statements wherein witnesses described Molina "snoring." Defendants are thus trying to justify the exclusion of Adelman based on the supposed difference between a layperson's description of "snoring" versus "quick, deep, irregular, and hard" Kussmaul breathes. That's an awfully thin basis on which to strike the entire opinion as *per se* unreliable; the distinction, to the extent it even exists, is far better suited to cross-examination than exclusion. Moreover, because OPS never asked any witnesses to expound on the nature of the snores, there is actually no way to discern whether they were in fact quick, deep, or hard.

Defendants' argument fails for another reason. Due to the truncated discovery schedule and the belated disclosure of the OPS file, see footnote 3, Adelman was deposed before fact discovery closed, and before certain witnesses were deposed. Thus, Adelman's January 2006 deposition answer on which Resp. 39 presently relies was given before Bischoff was deposed in March 2006, and before Vaccarello had been located or deposed in February 2008.

In summary, Defendants have unfairly seized upon a nonissue. While Adelman did initially acknowledge that no *then-known* witness specifically described irregular, deep, labored breathing, the truth is that Vaccarello and Bischoff subsequently came forward and described exactly that. Litigation is not a game where Adelman should be bound by admissions made two years before expert discovery closed (see *infra,* page 21), and before he got all the facts – particularly where Defendants contributed to delayed receipt of those facts (see fn. 3). Defendants know full well that evidence consistent with Kussmaul respirations did surface (assuming this truly was valid reason for exclusion, which, as explained, it is not) once the witnesses were finally deposed. Throwing Adelman's premature deposition answers in his face hardly bolsters Defendants' position.

**3. Post-Mortem Glucose Levels Are Irrelevant**

This is the classic red herring. Resp. 40 *agrees* with the "textbook" wisdom that "no reliable interpretation can be made" from post-mortem glucose levels, which drop after death. Molina's may have been higher than 112 when she died, they may not have been. It's a wash. Post-mortem glucose levels do not support Adelman's theory, but do not undercut it either. But by no stretch do they support a conclusion that Adelman's opinion was properly barred as unreliable.

### 4. Possible Absence Of Keotones Does Not Support Exclusion

Defendants are almost out of justifications for Adelman's exclusion, and their arguments are not getting any stronger.

Their last shot concerns keotones. Adelman testified that he would "expect" keotones if his theory was correct. However, Adelman never suggested that absence of keotones was dispositive. R130-3 at 79. Neither the district court nor Defendants offer any explanation for how the absence of keotones (assuming *arguendo* there was one) fatally compromises the reliability of Adelman's opinion.

That dispositive flaw aside, there is an even bigger problem. The toxicology reports disprove Defendants' suggestion that tests were run for the presence of keotones. In fact, the reports list tests for only ten substances: ethanol, codeine, morphine, benzoylecgonine, glucose, urea nitrogen, creatinine, sodium, potassium, and chloride. See Appendix 13-14. Thus, Adleman's answer that he didn't think tests for keotones were run was actually correct. Defendants have thus not established any "absence" of keotones, even assuming *arguendo* such an absence had real meaning. Defendants have not pointed to any testimony, document, or other reason to conclude differently.

This entire issue was thus another factual assumption that the district court simply got wrong. Even were that not so, however, the issue is at best the sort for which cross-examination might be appropriate. Exclusion of the expert altogether on this basis was an abuse of discretion.[7]

---

[7] Finally, Dr. Adelman did not testify that diabetic ketoacidosis does not appear in Type II diabetes. Resp. 41. He stated "it would be more presented in Type I." R130-3 at 80.

* * * *

That's all there is. Defendants offer a grand total of four reasons supporting the district court's "reliability" rejection of Adelman's diabetes opinion, and none is even remotely sound. Under no fair accounting do they add up to exclusion of a qualified pathologist providing a diabetes opinion as well-supported and unimpeached as Adelman's here.

**C. Adelman's Myxedema Opinion Should Not Have Been Barred**

Resp. 42 musters a single paragraph to support the court's exclusion of Adelman's opinion about how deprivation of Molina's thyroid medicine contributed to her demise. Downplaying the issue does not make it go away.

Molina had no thyroid. To compensate for absence of thyroxine, Molina's records show that she took powerful drugs (*inter alia,* .15 mg of Synthroid, daily), without which she risked slipping into a fatal myxedema coma. As summarized in Plaintiff's opening brief, Molina's autopsy photos (showing face and body proportions) were typical of myxedema.

This is a straightforward opinion by a qualified pathologist. The court offered virtually no analysis on the myxedema opinion. In defending the resulting exclusion, Defendants offer so little substance (Resp. 42) that it is difficult for this Reply to identify any argument on which to engage. Defendants basically just repeat the court's inaccurate contention that Adelman did not know Molina's drugs or dosages. As already explained, this assumption is false.

The remainder of Defendants' paragraph on the myxedema opinion contains no record citations, no counter-opinions, and no real arguments – just some vague assertions that would hardly even qualify as legitimate cross-examination. Outright exclusion of the opinion on these (or any other) grounds is impossible to justify.

Nor is Defendants' argument bolstered by repeatedly invoking the "speculation" refrain. There are no scientific certainties in this field. Many deaths present conundrums far more perplexing than this one, yet experts routinely testify to well-supported differential diagnoses based on available evidence. This is not the sort of junk science that courts should be weeding out. It is hardly a wild hypothesis that a fragile, obese diabetic without a thyroid could slip into a coma and die if deprived of her medications throughout an unusually and inexplicably prolonged detention.

Plaintiff is not asking this Court to find Defendants liable. Plaintiff merely requests a jury trial, at which Defendants could raise these points to try to undermine Adelman's opinions. That result, rather than outright exclusion and summary disposition, is what the law and fairness require.[8]

### D. The Medical Examiner's Opiate Intoxication Theory Is Far More Speculative Than Adelman's Opinions

There is a gaping hole in Defendants' position. Medical examiner Choi knew nothing of Molina's medical conditions and medications, and had seen none of her medical records. Yet Defendants ask this Court to accept Choi's conclusion over that of Adelman (who opined that opiate intoxication was not the likely cause of death). Defendants cannot have it both ways.

What it comes down to is this: Choi is entitled to his opinions. Even without the complete picture, pathologists regularly make deductions based on available evidence. Witnesses in Choi's shoes offer similar opinions in

---

[8] Defendants attempt to malign Dr. Adelman for having been forced to supplement his report (a total of five) as new evidence came in. As discussed *supra,* footnote 3, this criticism is misplaced. Defendants themselves persuaded the district court to conduct discovery in inefficient phases, resulting, for example, in withholding of the OPS file containing much of the critical witnesses and data. Proceeding in this fashion proved to have been a mistake. R266-5 at 28 (court's reference to "the total mess this case is in").

courtrooms every day, even in the face of uncertainties. Under well-settled law, Choi's opinions are sufficiently competent for the jury to consider.

But that is no less true of Adelman – who has more experience, consulted more literature, considered more evidence, and had more information.

### E. Even If Molina's Death Was Due, Even In Part, To Opiate Intoxication, Summary Judgment Was Still Inappropriate Given Dr. Carter's Opinion

For starters, exclusion of Dr. Carter's opinions cannot be reviewed for abuse of discretion because the district court never excluded them. Instead, the court ignored them.

**The Court Never Barred Carter As Untimely**

Resp. 44 contends the court supposedly excluded Carter as untimely. This is incorrect. The relevant history follows.

On December 20, 2007, the Court entered order allowing the parties until January 8, 2008 to name additional experts. R200. On January 4, all parties submitted an agreed motion, explaining that Defendants had recently hired outside counsel, and informing the Court of an agreement between the parties to extend the expert cut-off to February 15, in part so Defendants could comply with outstanding discovery. R201. The agreed motion was granted. R203.

Meanwhile, Plaintiff disclosed Carter's report on January 8, 2008, within the Court's *original* deadline. R233-14. Under no circumstances was the report untimely.

Defendants rely on a single sentence buried in a 40-page hearing transcript from March 24, 2008, wherein the court stated it "probably" would only consider Adelman's supplemental reports for forthcoming summary judgment motions. R266-5 at 31. While the court did then state "I'm not going to consider a new expert," Plaintiff's counsel proceeded to explain that she had already disclosed

Carter (who was thus not "new") and reminded the Court of the agreed discovery schedule. There was then more dialogue, whereupon the court stated: "The more we talk, the more confused the picture becomes." Id. at 32. Indeed, just two pages earlier from the one which Defendants now rely, defense counsel herself asked the Court to extend the time to submit new medical experts. Id. at 29. (The relevant transcript pages and orders are attached as Appendix 1-12).

Months later, when the court had the opportunity to more carefully consider Defendants' timeliness objection following summary judgment briefing, the court declined to adopt that objection. The court never actually "barred" Carter, and even if the sentence from the March 24 transcript could be construed thusly, it would be a plain abuse of discretion: the court provided no explanation as to why, with no prior warning, it could exclude as "untimely" an expert disclosed well before the court's own (agreed) disclosure date. Defendants do not presently even pretend to justify that result.

**Dr. Carter's Opinions**

Timeliness aside, there are no legitimate quarrels with the merits of Carter's opinions, and the district court never suggested otherwise.

Reviewing all of the evidence, and drawing on her experience, Carter opined that when presented with an unconscious patient with Molina's symptoms, medical professionals would have been looking for something like the tinfoil packet that was lodged in her esophagus. Carter further opined that even if Molina had been unable to speak, worsening respiratory effort would have suggested early intervention with narcotic antagonistic drugs, such as Narcan, which is very effective at reversing narcotic effects. Carter thus concluded that timely medical attention would have increased Molina's chances of survival, even assuming the cause of death was opiate-related.

Carter reviews evidence from analogous fact patterns all the time. That's her job. She is competent to opine in this realm, and, tellingly, Defendants never proffered any expert or evidence to challenge the validity of any of it.

Indeed, Defendants' Response is strikingly thin on the merits. It contains *a grand total of twelve lines of text* (Resp. 45) amounting to a few quibbles possibly suited for cross-examination. The only truly substantive argument is that Carter is not qualified to opine that auscultation or chest examinations are routinely performed on comatose patients who are struggling to breathe. To the contrary, Carter's professional responsibilities require her to review reports from innumerable cases with comparable fact patterns, R233-14, an adequate base of qualification.

In sum, none of Defendants' arguments come close to supporting outright exclusion. The district court never held as much, and neither should this Court.

As a last ditch effort, Defendants submit that even if Carter's opinion renders summary judgment unavailable, this Court should overlook the constitutional violations because Molina (possibly) contributed to her death by swallowing drugs.

Leaving aside the legitimate dispute over whether drugs had a role in Molina's death, the concept of proximate cause defeats this argument. It is "sufficient if [Defendants' violation] combines with another cause resulting in injury." I.P.I. 1501 (proximate cause "need not be the only cause, nor the last or nearest cause").

At bottom, Defendants are suggesting that even if they acted with reprehensible indifference in allowing their prisoner to slip into a coma and die, the Court should nonetheless excuse their constitutional violations on moral grounds. This is at best a jury argument, and an unattractive one. We

legitimately expect our public servants to adhere to constitutional standards, even when detainees act self-destructively. A guard cannot beat someone to death even if the victim brought the fight on himself. This is not the sort of argument made by a party who is winning the debate.[9]

## III. Qualified Immunity Is Unavailable

Despite repeated accusations of "waiver," Defendants seek to raise a new qualified immunity argument never presented below, namely, that they would not have known the Fourth Amendment standard applied rather than deliberate indifference.

Even if it hadn't been waived, the argument is flawed. The Fourth Amendment has long governed detainees prior to a probable cause hearing. Villanova v. Abrams, 972 F.2d 792, 797 (7th Cir. 1992); Luck v. Rovenstine, 168 F.3d 323, 326 (7th Cir. 1999). But more fundamentally, there is no material difference between the two standards as applied to this fact pattern. If the Fourth Amendment jury instruction is compared to one for deliberate indifference, to the extent there is any difference, it's meaningless in this context. Defendants took no action at all, and the only question is whether they had sufficient notice of a serious medical need. Put another way, Defendants' alleged misconduct satisfies either standard.

[9] Defendants' final argument is that Jamison and Gomez resumed duty too late to save Molina's life even if they had acted appropriately. This overlooks caselaw from Plaintiff's opening brief that increased suffering or even marginally increased probability of harm is actionable.

## IV. Over-Detention

Plaintiff stands on the arguments in her opening brief. Defendants still have no explanation for why Molina was still sitting in her cell on May 26 when her paperwork had been completed by the morning of May 25. Defendants do not even try to justify the over-detention.

Instead, Defendants argue that Ziemba and Lemon-Redmond cannot be accountable because, even though they took no action, their shift ended about an hour and a half after Molina was fully cleared for court. This hot potato defense is unavailing. Only the jury can decide if it was reasonable for them to go home without taking any steps to comply with the Constitution.

Finally, Plaintiff need not defeat Ziemba and Lemon-Redmond to prevail. The City desired to avoid litigation of its policies and practices. To that end, the City agreed on the record to stipulate that it would accept judgment against itself if Plaintiff proved a constitutional violation against one of the dozen named City employees on duty during Molina's detention. R196. Defendants should not now be permitted to back out of that representation merely because (as Resp. 40 argues) the stipulation was not in writing.

Respectfully Submitted:

____________________________
Attorneys for Plaintiff-Appellant

Arthur Loevy
Jon Loevy
Elizabeth Wang
Loevy & Loevy
312 North May
Suite 100
Chicago, IL 60607

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 31(e)

I, Jon Loevy, an attorney, certify that I have filed electronically, pursuant to Circuit Rule 31(e), a version of the brief in a non-scanned PDF format and that no Appendix items are available to be filed in a such a manner.

/s/Jon Loevy

## FED. R. APP. P. 32(a)(7)(B)(ii) Certificate

Undersigned Counsel certifies that counsel's word processing program (WP 12) counts 6,999 words, exclusive of the signature block and the certificates.

/s/Jon Loevy

## CERTIFICATE OF SERVICE

I, Jon Loevy, certify that on January 28, 2011, I served the attached Reply Brief by placing two bound paper copies and one computer disc containing the digital version in an envelope with sufficient postage affixed and directed to counsel of record, and by depositing each envelope in the United States mail box located at 312 N. May St., Chicago, Illinois 60607 on January 28, 2011.

/s/Jon Loevy

# APPENDIX

## TABLE OF CONTENTS TO APPENDIX

Transcript, March 5, 2008 (R266-5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-6

District court order, 12/20/07 (R200) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Joint (Agreed) Motion to Extend Date for Expert Disclosures (R201) . . . . . . . . . 8-10

District court order, 1/8/08 (R203) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

District court order, 1/30/08 (R222) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Toxicology reports (Choi Deposition Exh. 8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-14